UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN ATHEISTS, INC.,
STEVE WALKER, THE LAW OFFICES
OF DENNIS G. VATSIS, P.C.,
and DENNIS G. VATSIS,

                    Plaintiffs,                        Judge Avern Cohn

v.                                         Case No. 06-11696

CITY OF DETROIT DOWNTOWN
DEVELOPMENT AUTHORITY

                    Defendant,

and

ST. JOHN'S EPISCOPAL CHURCH,

                    Intervening Defendant.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART:**
**(1) PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; (2) DEFENDANT'S**
**COUNTER-MOTION FOR SUMMARY JUDGMENT; AND (3) INTERVENING**
**DEFENDANT'S COUNTER-MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This is a First Amendment case. American Atheists, Inc., Steve Walker, the Law

Offices of Dennis G. Vatsis, P.C., and Dennis G. Vatsis (collectively, the plaintiffs) claim

that the City of Detroit Downtown Development Authority (DDA) has violated the

Establishment Clauses of the federal Constitution and Michigan's Constitution by

agreeing to distribute, through reimbursement grants, tax-generated funds to three

churches for having completed repairs or improvements to the exteriors of several of

their structures and parking lots as part of the "Lower Woodward Façade Improvement

Plan" (FIP). St. John's Episcopal Church (St. John's) –one of the three churches anticipating receiving a reimbursement grant –joins as an intervening defendant. The United States has submitted an *amicus curiae* brief on behalf of the defendants.

Before the Court are the plaintiffs' motion for summary judgment and the DDA and St. John's cross-motions for summary judgment. The plaintiffs ask for a declaratory judgment that the FIP is unconstitutional as applied to the churches, and that the DDA's anticipated distribution of reimbursements as well as the payment of preliminary architectural and design fees on behalf of the churches, violates the Constitution of the United States, and the Michigan Constitution. The plaintiffs also ask for a preliminary and permanent injunction restraining the DDA from paying the reimbursement grants and requiring the DDA to recoup monies paid for preliminary architectural and design fees on behalf of the churches.

The defendants ask the Court to find the FIP as applied to the churches, the distribution of the individual reimbursement grants, and the payment of the architectural fees on behalf of the churches, to be constitutional.

The parties have stipulated that there are no material questions of fact regarding the FIP or the reimbursement contracts between the DDA and the three churches. Therefore, this decision addresses only the FIP's constitutionality as applied to the churches, and the constitutionality of the individual reimbursement contracts.[1]

For the reasons that follow, the Court finds that the FIP is constitutional despite

---

[1] Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

the fact that it allows churches to be the recipients of reimbursement grants. The Court also finds that the reimbursement contracts between the DDA and the churches are constitutional, with exception to the portions which would reimburse the churches for the improvement or replacement of the monolithic signs in front of the sanctuaries, and for work done to two stained glass windows containing religious images at St. John's sanctuary.

## II. BACKGROUND [2]

### A.

The DDA is a public body corporate. M.C.L. § 125.1652(2). The funds it distributes are derived from taxes levied by the City of Detroit and other units of government. In June, 2003, the Detroit City Council adopted the FIP as an amendment to the "Restated City of Detroit Downtown Development Authority Tax Increment Financing Plan and Development Plan for Development Area No. 1." [3] The FIP authorized the DDA to allocate tax-derived funds to approved applicants

---

[2] The background is gleaned from (1) the Order Re: Statement Of Facts Not In Dispute, issued May 18, 2007; (2) the Stipulation Of The Parties To Additional Proposed Undisputed Facts, filed June 4, 2007; and (3) the "Lower Woodward Façade Improvement Program Policy and Guidelines."

[3] The statute creating the DDA, M.C.L. § 125.1651a, states in subsections (f) and (h) the following:

(f) That halting property value deterioration and promoting economic growth in the state are essential governmental functions and constitute essential public purposes.

(h) That the provisions of this act are enacted to provide a means for local units of government to eliminate property value deterioration and to promote economic growth in the communities served by those local units of government.

3

by reimbursement contract. The contracts provide for the direct payment to approved applicants of 50% of the cost of repairs or improvements to the façades of their structures and parking lots with a maximum of $150,000.00 for each structure and $30,000.00 for each parking lot. The FIP was created, in part, in anticipation of a huge influx of visitors to the City of Detroit for the Major League Baseball All-Star Game in 2005 and the National Football League SuperBowl in 2006.

**B.**

A description of the FIP and the criteria/eligibility for funds was set forth in the "Lower Woodward Façade Improvement Program Policy and Guidelines" (Program Policy and Guideline). <u>See</u> Exhibit A, attached.[4]

**1. Purpose and Goals of the FIP**

The FIP's was created to:

encourage improvements to building facades and upgrades to edges of surface parking lots in the Program Area. Façade improvements apply to the exterior of buildings and other structures visible from any street, including alley facades. Upgrades to parking lot edges are for street-side of the property only. By improving the appearance of the downtown area, the Program will accomplish the following goals and objectives:

• Support ongoing efforts to retain existing residents and businesses

• Support ongoing business development efforts to attract new businesses

• Complement the streetscape improvements underway

• Encourage occupancy of vacant and/or underutilized storefronts

• Increase the sense of security and community for existing and future

---

[4] Applicants could apply for reimbursement grants until December, 2005. Program Policy and Guidelines at section 0.4.

developments

Program Policy and Guidelines, section 0.1.

## 2. Eligible Participants and Projects

### a. Eligible Participants

All property owners and tenants (who received approval of the property owner) who owned or leased buildings, parking lots, or businesses within Downtown Development Area No. 1 were eligible to apply for and receive funds made available under the FIP.  Id. at section 1.3.

### b. Eligible Structural Projects

The Program Policy and Guidelines described the types of building/structural projects that were eligible for reimbursement grants as follows:

- **Architectural Features:**  Repair, replacement, preservation or installation of architectural features intrinsic to the character of the building, including cornices, bulkheads and transoms, as well as removal of non-historic features and inappropriate alterations

- **Storefront Windows:**  Restoration of damaged display windows and replacement of unsuitable windows

- **Exterior Lighting:**  Replacement of damaged and inappropriate lighting with fixtures suitable for the building's period and character

- **Masonry and Brickwork:**  Power and/or mild chemical washing of masonry and brickwork.  Tuck-pointing and replacement of missing pieces

- **Awnings and Shutters:**  Repair, replacement or installation of awnings and shutters

- **Exterior Doors:**  Repair, replacement and installation of exterior doors and hardware to provide public access, to correct existing code violations or to improve the overall appearance of the building

- **Windows:**  Repair or replacement of frames, sills and sashes; caulking and

glazing

• **Painting:** Painting of the façades of the building visible from the street with approved colors and paint

• **Signage:** Removal of signs that are unused, illegal, or not in compliance with City zoning and sign ordinances, repair of existing appropriate and legal signs, or replacement of inappropriate signs

Id. at section 1.4.1.

### c. Eligible Parking Lot Projects

The Program Policy and Guidelines described the types of parking lot projects

that were eligible for reimbursement grants as follows:

• Compliance with City of Detroit Gateway Radial Thoroughfare Ordinance for parking lot landscaping requirements

• Installation of fencing, brick piers, new curbs, new approaches, shrubbery, irrigation, lighting and other upgrades along the street-side edges of parking lots

• Removal of existing treatments unsuitable for the planned character of the district or that violate City ordinance are also eligible

Id. at section 1.4.2.

### d. Architectural Restrictions on Projects

The Program Policy and Guidelines also imposed the following limitations on

projects that were eligible for reimbursement grants as follows:[5]

• Work must be compatible with and complimentary to the architectural features of the existing buildings in the project area

• No work may be performed that will jeopardize the status of a historical building or change the façade from its original design

Id. at 1.1.

---

[5] Additional limitations are listed in section 1.1.

6

### 3. Outreach to Potential Applicants

A Façade Program Manager was appointed to conduct outreach to applicants as

follows:

> Owners within the Program Boundary will be surveyed to determine
> their building improvement needs and level of interest in participating in
> the Program.  They will have the opportunity to attend informational
> workshops, receive Program materials and instruction on the application
> process.
> . . . .
>
> . . . . The outreach to potential participants is achieved through an
> effective marketing campaign with collateral materials.  The materials
> include a brochure with program application, eligibility and regulatory
> information, and photographic documentation.
> The marketing activities include various public forums and
> workshops, surveys of property owners and press communications.
> Strategies for converting reluctant owners have been identified and
> include one-on-one meetings where testimonials and the financial
> advantages of participation are presented.

Id. at sections 0.3.4; 1.6.1; and 4.3.1.2.

### 4.  Applicant Requirements

Projects were coordinated and managed by Madison Madison International

(MMI), a professional program management firm.  Id. at section 0.3.4.

Applicants were required to precisely document the proposed façade and parking

lot projects, submit contractor estimates and a description of the work to be performed.

Applicants were also required to provide evidence of their ability to finance the project.

Id. at section 1.6.3.

The Façade Program Manager reviewed the initial application for completeness.

If given notice-to-proceed, the applicant selected an architect from a list of pre-qualified

design firms to prepare a conceptual design.  The conceptual design was supposed to

ensure that the proposed projects are within the FIP's guidelines. The FIP paid for the conceptual design costs if the applicant selected a pre-qualified firm to complete the design. Id. at section 1.6.4a.

The conceptual design had to then be approved by the Façade Program Manager, the DDA Design Review Committee, and finally, the DDA Board. Id. at sections 1.6.4b and 1.6.5.

If the conceptual design was approved, the applicant and the DDA entered into a reimbursement agreement/contract in which the applicant agreed to complete the project and pay 100% of the costs, and the DDA agreed to later reimburse the applicant for 50% of the cost of the completed projects. Id. at 1.6.7. The Façade Program Manager could make payments to an applicant only after a projects was completed and the Façade Program Manager received notarized statements from the contractors describing the work performed, and proof that the applicant paid the contractor. Id. at section 1.6.12.

**C.**

The DDA received a total of 204 applications for projects. One hundred eighty-nine projects were deemed eligible for reimbursements, 123 projects were approved by the DDA Board, and ninety-one projects were completed. The DDA has allocated funds or intends to allocate funds to all ninety-one property owners who completed their projects, and submitted verifying documentation to the Façade Program Manager.

Nine of the completed projects are the subject of reimbursement contracts between the DDA and three churches –Central United Methodist Church (CUMC), Second Baptist Church, and St. John's (collectively, the churches). The churches are

8

religious organizations and ecclesiastical corporations under Michigan law.[6]  Because

of this litigation, the DDA has not distributed any of the reimbursement grants to the

churches.

The churches' nine completed projects are described below:

---

[6] CUMC was designated a National Historic Site on August 3, 1992, and designated a State of Michigan Historic Site on June 6, 1977.  The Second Baptist Church was designated a National Historic Site on March 19, 1975, and designated a State of Michigan Historic Site on September 17, 1974.  St. John's was designated a National Historic Site on August 3, 1983, and designated a State of Michigan Historic Site on June 10, 1987.

**1. Central United Methodist Church**

| STRUCTURE | NATURE OF PROJECTS | AMOUNT |
|---|---|---|
| Sanctuary at 23 E. Adams used for religious worship | repair and refinishing of entry doors, cleaning and repair of façade, cleaning and repair of sign, refurbishing of steeple clock and various light fixtures, and rebuilding of masonry planter | $133,708.00 [7] |
| Activities building at 31 E. Adams used for Sunday school, choir robing, church offices, offices of community groups, and other ancillary and rental uses | repair of granite panels, replacement of overhang, repair and cleaning of masonry walls, refurbishment of lighting, expansion of entranceway, and installation of new doors | $118,985.95 |
| Paved parking lot at 28 E. Elizabeth used by church patrons to park during religious services and activities, as well as by community groups that use and rent space in the activities building, and rented out to the public | installation of an irrigation system, landscaping, and installation of fencing | $30,000.00 |
| Paved parking lot at 2026 Woodward used by church patrons to park during religious services and activities, as well as by community groups that use and rent space in the activities building, and rented out to the public | installation of irrigation system, landscaping, and installation of fencing | $30,000.00 |

---

[7] Minus the expense for an altar light, which was not approved.

## 2. Second Baptist Church

| STRUCTURE | NATURE OF PROJECTS | AMOUNT |
|---|---|---|
| Sanctuary at 441 Monroe used for religious worship. It is also rented to community groups for meetings with the church's permission | replacement of brick front, metal coping repaired or replaced, stained glass windows repaired and re-framed with protective glass coverings, installation of exterior wood doors; painting of building trim, doors, and storm gutters; replacement of church sign | $150,000.00 |
| Education building at 461 Monroe used for church offices, fellowship hall, rest rooms, and other meeting and ancillary uses | cleaning and repair of precast panels, removal and caulking of glass, installation of a new planter box, a new concrete ramp, a new storefront, and removal of front canopy | $82,008.88 |
| Paved parking lot at 421 Monroe used by church patrons to park during religious services and other religious activities, and church employees | installation of fence with operable gate, new bumpers, lot surfacing and striping | $30,000.00 |
| Rental property at 419 Monroe is a nightclub/bar that the church leases to a company called Onyx. The church receives $2,200.00 per month in lease payment | cleaning and repair of exterior of building, cleaning and repair of front door, replacement of windows, replacement of fabric awning | $78,368.50 |

**3. St. John's**

| STRUCTURE | NATURE OF PROJECTS | AMOUNT |
|---|---|---|
| • Sanctuary and parking lot at 50 E. Fisher Hwy used for religious worship, and regularly used for non-religious community events and meetings<br>• Paved parking lot used by church patrons for religious services and other religious activities, and church employees; the parking lot is shared with Comerica Park for Detroit Tigers Baseball games | repair of stone wall, repair of fence, installation of canopy over entranceway, replacement of sign, cleaning and repair of stained glass windows and installation of protective covering, replacement of trees and bedding in parking lot | $83,851.75 |

The plaintiffs filed this suit on April 7, 2006. American Atheists, Inc., is a volunteer organization active in protecting the rights of atheists and dedicated to the separation of church and state. It has at least one member who owns or leases real or personal property located in Downtown Development Area No. 1, and who pays taxes that have been allocated or set aside for allocation by the DDA under the FIP. The remaining plaintiffs own or lease real or personal property located in Downtown Development Area No. 1 and pay taxes that have been allocated or set aside for allocation by the DDA under the FIP.

### III. THE LEGAL FRAMEWORK

The First Amendment to the Constitution of the United States provides that "Congress shall make no law respecting an establishment of religion." Under the Fourteenth Amendment, the states and their agencies are subject to the Establishment

Clause of the First Amendment of the Constitution. <u>Cantwell v. Connecticut</u>, 310 U.S. 296, 303 (1940).[8]

Generally speaking, in order for a government program to be held constitutional under the Establishment Clause, it must pass muster under what is known as the "Lemon" test:

> [1] First, the [government program] must have a secular legislative purpose; [2] second, it principal or primary effect must be one that neither advances nor inhibits religion; and [3] finally, the [government program] must not foster an excessive government entanglement with religion.

<u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612-13 (1971) (citations and internal quotations omitted); <u>see also Agostini v. Felton</u>, 521 U.S. 203, 232-34 (1997) (the third <u>Lemon</u> prong is best understood as a separate strand of the second prong).

---

[8]    Article 1, Section 4 of the Michigan Constitution states:

Every person shall be at liberty to worship God according to the dictates of his own conscience. No person shall be compelled to attend, or, against his consent, to contribute to the erection or support of any place of religious worship, or to pay tithes, taxes or other rates for the support of any minister of the gospel or teacher of religion. No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary; nor shall property belonging to the state be appropriated for any such purpose. The civil and political rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious belief.

The plaintiffs' claim under the Establishment Clause of the Michigan Constitution, Article 1, Section 4, is based on the same facts and arguments as their federal claim. The analysis and outcome of the issues under the federal Constitution applies to the state Constitution. <u>See Scalise v. Boy Scouts of America</u>, 265 Mich. App. 1, 12 (2005) ("[O]ur Establish Clause analysis, like the federal analysis, is governed by <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971)").

## IV.   Whether the FIP has a Secular Legislative Purpose

This prong of the <u>Lemon</u> test is not at issue.  The parties agree that the FIP was created for a secular purpose.  The FIP was created to spark and maintain economic growth and development in downtown Detroit's Development Area No. 1 through the improvement of the landscape (i.e. structures and parking lots) viewed by the public, and also created in anticipation of the large numbers of visitors to Development Area No. 1 for the All-Star and SuperBowl games.  The Court gives deference to the state's articulated secular purpose.  <u>Mueller v. Allen</u>, 463 U.S. 388, 394-95 (1983) ("We are reluctan[t] to attribute unconstitutional motives to the states, particularly when a plausible secular purpose for the state's program may be discerned from the face of the statute.")

## V.   Whether the Primary Effect of The FIP is to Advance or Inhibit Religion

### A.   The Standard

In <u>Agostini v. Felton</u>, 521 U.S. 203, 234 (1997), the Supreme Court held that a [government program] does not have the primary effect of advancing or inhibiting religion if it does not "[1] result in governmental indoctrination; [2] define its recipients by reference to religion; or [3] create an excessive entanglement."

### B.   Whether the FIP Results in Governmental Indoctrination

### 1.   Restrictions on Aid to Pervasively Sectarian Institutions

### a.

The plaintiffs argue that under Supreme Court precedents, the government is prohibited from giving aid for the construction or structural maintenance of facilities used by "pervasively sectarian institutions" because such aid inevitably advances the

institution's religious message, thus leading to governmental indoctrination:

> Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting.

Hunt v. McNair, 413 U.S. 734, 743 (1973).[9]

The prohibition on government aid to pervasively sectarian institutions underlies the Supreme Court's decisions in two cases relied upon by the plaintiffs: Tilton v. Richardson, 403 U.S. 672 (1971), and Comm. For Pub. Educ. v. Nyquist, 413 U.S. 756 (1973). In Tilton the Supreme Court struck down a portion of the Higher Education Facilities Act of 1963, §§ 101-111, 401(a)(2). Id. at 683. The Act provided construction grants to both secular and church-related colleges and universities for the construction of educational facilities. Id. at 675. Regarding the grants to church-related institutions, the Act prohibited the funding of "any facility used or to be used for sectarian instruction or as a place for religious worship or * * * any facility which * * * is used or to be used primarily in connection with any part of the program of a school or department of divinity." Id. To ensure that the buildings were not being used for religious activities, the government retained a twenty-year interest in any facility constructed with funds

---

[9] In Hunt, the Supreme Court upheld South Carolina's statutory scheme for aiding colleges by issuing revenue bonds for the construction and financing of school facilities. The statutory scheme specifically excluded aid for the construction or financing of facilities used for secular study or religious worship. The Supreme Court held that the bonds did not have primary effect of advancing or inhibiting religion because the proposed transaction at issue (to be used for refinancing capital improvements and completing a dining hall) involved a college that had no significant sectarian orientation, and the lease agreement included a provision forbidding religious use of the facility and allowing inspections to enforce the agreement.

under the Act.  Id.  "If, during this period, the recipient violate[d] the statutory conditions, the United States [was] entitled to recover an amount equal to the proportion of its present value that the federal grant bore to the original cost of the facility."  Id.

A challenge was made against four church-related colleges and universities that received construction grants.  The Supreme Court found the Act to be constitutional, with exception of the twenty-year limitation on the use of the facilities for religious purposes.  Id. at 683.  The Court reasoned that this provision was insufficient to guard against governmental indoctrination because if, at the end of the twenty-year period, a facility is used for religious purposes, "the original federal grant will in part have the effect of advancing religion."  Id.

The plaintiffs extend the reasoning of the Court in Tilton in arguing that:

[i]f tax-raised funds may not be granted to educational institutions where the possibility exists that those funds will be used to construct a facility utilized for sectarian activities twenty years hence, *a fortiori* tax funds may not be distributed to churches for maintenance and repair of places of worship and other religious activity without any limitation on their use.

Next, in Nyquist, 413 U.S. at 774-77, the Supreme Court held unconstitutional an amendment to New York's Education and Tax Laws which provided private schools with grants for the maintenance and repair of their facilities.[10]  "Maintenance and repair" was defined by the amendment as including:

the provision of heat, light, water, ventilation and sanitary facilities; cleaning, janitorial and custodial services; snow removal; necessary

[10] N.Y. LAWS 1972, c. 414, § 1, amending N.Y. EDUC. LAW. Art. 12. §§ 549-553. Several other amendments were also challenged in this case, such as an amendment which provided parents with direct tuition reimbursements for sending their children to private schools.  Nyquist, 413 U.S. at 756-66.

upkeep and renovation of buildings, grounds and equipment; fire and
accident protection; and such other items as the commissioner may deem
necessary to ensure the health, welfare and safety of enrolled pupils.

Id. at 763.  Practically all the schools entitled to receive reimbursement grants were

related to the Roman Catholic Church and taught Catholic religious doctrine to some

degree.  Id. at 768.  Under these circumstances, the Supreme Court held that the

amendment had the primary effect of advancing the religious mission of the schools

receiving the grants because:

No attempt is made to restrict payments to those expenditures related to
the upkeep of facilities used exclusively for secular purposes, nor do we
think it possible within the context of these religion-oriented institutions to
impose such restrictions. Nothing in the statute, for instance, bars a
qualifying school from paying out of state funds the salaries of employees
who maintain the school chapel, or the cost of renovating classrooms in
which religion is taught, or the cost of heating and lighting those same
facilities. Absent appropriate restrictions on expenditures for these and
similar purposes, it simply cannot be denied that this section has a primary
effect that advances religion in that it subsidizes directly the religious
activities of sectarian elementary and secondary schools.

Id. at 774 (emphasis added).

Referring to its decision in Tilton, the Supreme Court reasoned that "[i]f the State

may not erect buildings in which religious activities are to take place, it may not maintain

such buildings or renovate them when they fall into disrepair."  Id. at 777.

The plaintiffs argue that the Supreme Court's rationale in Nyquist prohibits the

DDA from reimbursing the churches here because the state will be maintaining and

renovating structures which are inarguably used for religious activities.

**b.**

The defendants respond that the Supreme Court has long held constitutional

government aid to pervasively sectarian institutions –where the aid is made generally

available to the public on the basis of neutral criteria.  See Everson v. Board. of

Education of Ewing Township, 330 U.S. 1, 17 (1947) (upholding a statute providing

parents with reimbursement for the cost of sending their children to school on public

buses, regardless of whether the school attended was public, private, or religious,

where the purpose was to ensure children's safe transport).  The defendants argue that

the Supreme Court recognizes the distinction between providing aid to pervasively

sectarian endeavors and providing generally available government aid to pervasively

sectarian institutions (such as ordinary police and fire protection, connections for

sewage disposal, public highways and sidewalks), with the latter being constitutional.

Everson, 330 U.S. at 17-18.[11]

Second, the defendants assert that the holdings in Hunt, Tilton, and Nyquist

have been undermined by the Supreme Court's more recent decision in Mitchell v.

Helms, 530 U.S. 793 (2000), concerning government aid to religious schools.  The

plaintiffs argue that the Mitchell plurality clearly abandoned the prohibition on

government aid to pervasively sectarian institutions when it stated: "the religious nature

of a recipient should not matter to the constitutional analysis, so long as the recipient

adequately furthers the government's secular purpose."  Id. at 827.  Moreover, the

plurality stated that "nothing in the Establishment Clause requires the exclusion of

pervasively sectarian schools from otherwise permissible aid programs, and other

---

[11] Likewise, the Supreme Court has upheld government aid to pervasively sectarian institutions for secular purposes.  Bradfield v. Roberts, 175 U.S. 291 (1899) (upholding a congressional appropriation of money for a hospital managed by members of the Roman Catholic Church, which agreed to treat impoverished patients).

doctrines of this court bar it.  This doctrine, born of bigotry, should be buried now."  Id. at

829.  The defendants further argue that the factors set forth in the plurality and

concurring opinions of Mitchell clearly support the constitutionality of the reimbursement

grants to the churches here.

A review of Mitchell establishes that since the decisions in Nyquist and Tilton,

there has been a jurisprudential shift in the Supreme Court's view of government aid to

pervasively sectarian institutions which this Court is obligated to recognize.[12]  As the

parties agree that Mitchell is the latest precedent regarding the issue of government aid

to pervasively sectarian institutions, an extensive evaluation of the case and its

applicability to the facts here is warranted.

### 2.  Mitchell v. Helm

### a.  Factual Background

In Mitchell, six justices upheld Chapter 2 of the Education Consolidation and

---

[12]   Regarding the approach to be taken when analyzing Establish Clause cases,
Chief Justice Burger stated in the plurality opinion of Tilton that:

> [T]he Court treat[s] the three main concerns against which the
> Establishment Clause sought to protect: "sponsorship, financial support,
> and active involvement of the sovereign in religious activity."  Walz v. Tax
> Comm'n, 397 U.S. 664, 668 (1970).
>      Every analysis must begin with the candid acknowledgment that
> there is no single constitutional caliper that can be used to measure the
> precise degree to which these three factors are present or absent.
> Instead, our analysis in this area must begin with a consideration of the
> cumulative criteria developed over many years and applying to a wide
> range of governmental action challenged as violative of the Establishment
> Clause.

403 U.S. at 677-78.

Improvement Act of 1981, as amended, 20 U.S.C. §§ 7301 -7373 (Chapter 2), which distributed federal funds (via State Educational Agencies) to Local Education Agencies (LEAs).  530 U.S. at 801.[13]  The LEA's in turn lent educational materials and equipment to public and private elementary and secondary schools.  Id. at 802.  The amount of aid allocated to each school was based on the number of students enrolled in the school. Id.  Schools received aid by submitting to its LEA an application detailing what materials and equipment it was seeking and how it planned to use them.  Id. at 803.  If the LEA approved the application, it purchased the materials and equipment with the school's allocation of funds, and lent them to the school.  Id.  Chapter 2 funds were used to provide the following materials and equipment to religious schools: library books, computers, computer software, slide and movie projectors, overhead projectors, television sets, tape recorders, VCRs, projection screens, laboratory equipment, maps, globes, filmstrips, slides and cassette recordings.  Id.  Chapter 2 restricted the use of the materials and equipment for "secular, neutral, and nonideological" education programs.  Id. at 802.

The parties in Mitchell agreed that Chapter 2 had a secular purpose and did not cause excessive entanglement between religion and the government.  Id. at 808. Accordingly, the only issues before the Court were whether Chapter 2 had the primary effect of advancing religion by leading to governmental indoctrination or by defining its recipients by reference to religion.  Id.

---

[13]  The plurality opinion, written by Justice Thomas, was joined by Justices Rehnquist, Scalia, and Kennedy.  Justice O'Connor wrote a concurring opinion in which Justice Breyer joined.

### b. The Plurality Opinion

The plurality held that Chapter 2 did not result in governmental indoctrination.

Mitchell, 530 U.S. at 808.  In reaching its decision, the plurality explained that the

neutral availability of the funds was crucial to the constitutionality of the program:

> [W]hether governmental aid to religious school results in governmental
> indoctrination is ultimately a question [of] whether any indoctrination that
> occurs in those schools could reasonably be attributed to governmental
> action . . .
>    In distinguishing between indoctrination that is attributable to the
> State and indoctrination that is not, we have consistently turned to the
> principle of neutrality, upholding aid that is offered to a broad range of
> groups or persons without regard to their religion.  If the religious,
> irreligious, and areligious are all alike eligible for governmental aid, no one
> would conclude that any indoctrination that any particular recipient
> conduct has been done at the behest of the government.

Id. at 809.

Also noteworthy was the plurality's comment that the government program in

Nyquist was unconstitutional, not because it provided direct funds to religious schools,

but because the funds were not neutrally available:

> [A]t least some of our prior cases striking down direct payments involved
> serious concerns about whether the payments were truly neutral.  See,
> e.g., Nyquist, 413 U.S. at 762-764, 768 (striking down, by 8-to-1 vote,
> program providing direct grants for maintenance and repair of school
> facilities, where payments were allocated per-pupil but were only available
> to private, nonprofit schools in low-income areas, " 'all or practically all' " of
> which were Catholic).

Id. at 819, n. 8.

The plurality also stated that a safeguard or assurance against governmental

indoctrination is present when government aid reaches a religious school by way of

private choice:

> As a way of assuring neutrality, we have repeatedly considered whether

any governmental aid that goes to a religious institution does so only as a result of the genuinely independent and private choices of individuals. We have viewed as significant whether the private choices of individual parents as opposed to the unmediated will of government determine what schools ultimately benefit from the governmental aid, and how much.

Id. at 810 (internal citations and quotations omitted).

Turning to the facts, the plurality concluded that Chapter 2 was neutrally available because the funds were allocated on the basis of neutral secular criteria –the number of students enrolled in the school. Id. at 829. The plurality found that this criteria neither favored nor disfavored religion, and was available to both religious and secular schools on a nondiscriminatory basis. Id. at 829-830. The plurality also stated that Chapter 2 was neutrally available because the amount of funds allocated to each school was ultimately (though indirectly) based on private choice because students and their parents –not the government – determined which school a child attends. Id. at 830.

Next, the plurality stated that even where government aid to religious schools is divertable,[14] or is in fact diverted, a government program may still be constitutional. Id. at 820-22. The plurality explained that the issue is not whether aid may be or is in fact diverted, but whether the aid contains impermissible content:

[A] "no divertibility" rule is inconsistent with our more recent case law [[15]]

---

[14] "[D]iversion is the use of government aid to further a religious message." Mitchell, 530 at 821 (citing Zorbrest v. Catalina Foot Hills Sch. Dist., 509 U.S. 1, 22-23 (1993)).

[15] The plurality noted that in Zorbrest, 509 U.S. 1, and in Witters v. Washington Dept. of Services for Blind, 474 U.S. 481 (1986), the Supreme Court upheld two programs in which neutrally available government aid, if provided, would have been diverted. In Zorbrest, 509 U.S. at 22, the Supreme Court upheld a portion of the

and is unworkable. So long as the governmental aid is not itself "unsuitable for use in the public schools because of religious content," <u>Bd. of Ed. of Central Sch. Dist. No. 1 v. Allen</u>, 392 U.S. 236, 245 (1968), and eligibility for aid is determined in a constitutionally permissible manner, any use of that aid to indoctrinate cannot be attributed to the government and is thus not of constitutional concern.

<u>Id</u>. at 821.

The plurality then held that Chapter 2 was constitutional because the available materials and equipment did not contain impermissible content and the Act specifically restricted the use of the materials and equipment to "secular, neutral, and nonideological" purposes.  <u>Id</u>. at 831

### c.  Justice O'Connor's Concurring Opinion

Justice O'Connor summarized the plurality's opinion as follows:

Reduced to its essentials, the plurality's rule states that government aid to religious schools does not have the effect of advancing religion so long as the aid is offered on a neutral basis and the aid is secular in content.  The plurality also rejects the distinction between direct and indirect aid, and holds that the actual diversion of secular aid by a religious school to the

─────────────────────

Individuals with Disabilities Act, 20 U.S.C. § 400 <u>et seq</u>., that would provide a sign language interpreter for a deaf student attending a Catholic high school, despite the fact that a "state-employed sign-language interpreter would serve as the conduit for [the deaf student's] religious education."  The Supreme Court noted that the program was neutral because benefits would be distributed to any child who qualified under the Act without regard to the sectarian or secular nature of the school the child attended.  <u>Id</u>. at 10.  Moreover, the Supreme Court noted that there was no governmental indoctrination because "a government-paid interpreter will be present in a sectarian school only as a result of the private decision of individual parents."  <u>Id</u>.

In <u>Witters</u>, 474 U.S. 483, the Supreme Court upheld a Washington state job rehabilitation program for the blind, Wash. Rev. Code § 74.16.181 (1981), which offered monetary assistance to a blind person studying at a Christian college to become a pastor, missionary, or youth director.  The Supreme Court found no governmental indoctrination because the program paid a voucher directly to the applicant, who was able to choose which educational institution to attend.  <u>Id</u>. at 488.  Thus, any money that ultimately flowed to a religious institution did so only as a result of the genuinely independent and private choice of the applicant.  <u>Id</u>.

advancement of its religious mission is permissible.

530 U.S. at 837.

Justice O'Connor's views diverged from the plurality's in two key respects. First, O'Connor asserted that "neutrality is not alone sufficient to qualify the aid as constitutional" because the <u>actual diversion</u> of government aid for religious indoctrination is inconsistent with the Court's precedents requiring that government aid to schools not be used to advance the religious mission of the recipient schools. <u>Id</u>. at 840.[16] Thus, while neutrality is required, courts must also determine whether the government aid will be or is diverted in fact. <u>Id</u>. at 844. Such a determination "depends on the hard task of judging --sifting through the details and determining whether the challenged program offends the Establishment Clause. Such judgment requires courts to draw lines, sometimes quite fine, based on the particular facts of each case." <u>Id</u>. (citation omitted).

Justice O'Connor also pointed out that the Supreme Court has upheld programs in which government aid was in fact diverted (<u>see</u> discussion of <u>Zorbrest</u> and <u>Witters</u>, n.

───────────────

[16] <u>See e.g. Allen</u>, 392 U.S. 236, in which the Supreme Court upheld a New York statute, N.Y. EDUC. LAW § 701 (1967 Supp.), requiring local public school authorities to lend textbooks to all students in grades seven through twelve, including students attending private religious schools. The statute was upheld because the books covering mathematics, physics, foreign languages, history, and literature, were content-neutral, and there was no evidence that the schools were using the textbooks to advance the religious missions of the religious schools. <u>Id</u>. at 248. <u>See also Agostini</u>, 521 U.S. 203, in which the Supreme Court upheld a provision of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 6301 <u>et seq</u>., which sent public school teachers into private schools to provide remedial education to disadvantaged children. The Supreme Court found that there was no evidence showing that the government provided instructors teaching in a parochial schools were attempting to inculcate religion in students. <u>Id</u>. at 226-27.

13), only where the diversion was the consequence of the purely independent and private choice of the recipient.  Id. at 841.  Justice O'Connor asserted that the diversion of government aid without the intervening factor of a recipient's private choice is unconstitutional.  Id.  This is because where the government provides aid directly to a religious school, and that aid is diverted, "it is reasonable to say that the government has communicated a message of endorsement.  Because the religious indoctrination is supported by government assistance, the reasonable observer would naturally perceive the aid program as government support for the advancement of religion."  Id. at 842-43.

Second, unlike the plurality, Justice O'Connor did not require government aid to reach a religious school only through private choice.  Justice O'Connor did not agree with the plurality that Chapter 2 aid reached the schools through the private-choice of students and parents.  See id. at 842-43.[17]  Nonetheless, she upheld Chapter 2 after finding that there was no material evidence that the materials and equipment had in fact been diverted.  Id. at 865.

### d.  Interpretation of Mitchell v. Helm

The case research and the briefs of the parties reveal that the issue of whether

---

[17]  As Justice O'Connor explained:

In terms of public perception, a government program of direct aid to religious schools based on the number of students attending each school differs meaningfully from the government distributing aid directly to individual students who, in turn, decide to use the aid at the same religious schools.  In the former example, if the religious school uses the aid to inculcate religion in its students, it is reasonable to say that the government has communicated a message of endorsement.

Mitchell, 530 U.S. at 842-43.

the government may distribute money directly to a church through a "bricks and mortar" program is an issue of first impression. Thus the Court sits in the position of having to distill and transfer the salient factors upon which the <u>Mitchell</u> decision rests to the situation here. As Justice Souter has observed: "[a]t least since <u>Everson</u>, it has been clear that Establishment Clause doctrine lacks the comfort of categorical absolutes." <u>McCreary County, Ky. v. American Civil Liberties Union of Ky</u>, 545 U.S. 844, 860 n.10 (2005). While the constitutionality of government aid to churches through a bricks and mortar program is unchartered by previous courts, by virtue of the fact that religious schools and churches are both pervasively sectarian institutions concerned with religious indoctrination, the issue of whether government aid provided to churches leads to governmental indoctrination is similar to the issue of whether government aid provided to religious schools leads to governmental indoctrination. Thus, the decision in <u>Mitchell</u> is the guide for the Court's analysis here.

First, it is clear that the viability of the "pervasively sectarian" doctrine is in serious decline as the plurality in <u>Mitchell</u> expressly abandoned it and Justice O'Connor and Justice Breyer implicitly abandoned it by concurring with the decision to uphold the Chapter 2 program.[18] Thus, the fact that the FIP intends to distribute funds to churches

_____

[18] While the Court of Appeals for the Sixth Circuit recently declined to overrule the general prohibition of government aid to pervasively sectarian institutions on grounds that the Supreme Court has not expressly done so, the Court of Appeals did note that after <u>Mitchell</u> the viability of the prohibition is "questionable" and stated that it did not determine the outcome of the case. <u>Steele v. Indus. Dev. Bd.</u>, 301 F.3d 401, 408-09 (6th Cir. 2002) (upholding a local government issuance of tax-exempt bonds to a private religious university for construction of a library dominated by religious literature on grounds that the aid was indirect and was offered to a religion-neutral class of beneficiaries).

whose mission is religious indoctrination does not make the program unconstitutional

*per se.*   Neither does it appear to make a difference whether the reimbursement grant

will be directed to the improvement or repair of a church's sanctuary as opposed to its

education building, night club, or its parking lot.

Second, the fact that the DDA intends to give grants <u>directly</u> to the churches

does not render the FIP unconstitutional.  While the plurality in <u>Mitchell</u> appeared to

require that aid reach a religious institution only through the independent and private

choices of individuals, Justices O'Connor upheld the Chapter 2 program in <u>Mitchell</u>

despite finding that Chapter 2 funds did not reach the schools through private choice.

As explained by the Court of Appeals for the Fourth Circuit, Justice O'Connor's position

is binding:

> Because the plurality opinion for the Court did not garner a majority, we
> must examine the details of the [aid] [p]rogram under the rubric of Justice
> O'Connor's concurring opinion.  <u>See Simmons-Harris v. Zelman</u>, 234 F.3d
> 945, 957 (6th Cir. 2000) (" 'When a fragmented Court decides a case and
> no single rationale explaining the result enjoys the assent of five Justices,
> the holding of the Court may be viewed as that position taken by those
> Members who concurred in the judgments on the narrowest grounds'. ")
> (quoting <u>Marks v. United States</u>, 430 U.S. 188, 193(1977)(internal
> quotations omitted)).

<u>Columbia Union College v. Oliver</u>, 254 F.3d 496, 504 n.1 (4th Cir. 2001).

Moreover, the plurality's requirement that government aid reach a religious

school only through the independent and private choice of parents and students does

not logically extend to the bricks and mortar project here.  Where government aid to

schools is involved, the government's ultimate goal is for children to receive a benefit no

matter what kind of school an individual child attends.  Accordingly, neutrality is ensured

when the child is free to attend a secular or non-secular school and still receive the aid.

Here, the intended recipients of the government aid are the structures that are being improved or repaired. Thus, there is no need for the funds to first pass through individual hands so long as the FIP is neutral on its face and in its application.

What is clear from Justice O'Connor's concurrence with the plurality is that the neutrality of a program is essential to its constitutionality. Equally important is whether the program in fact, leads to the diversion of government aid:

> On the more refined question of precisely what sort of aid to sectarian entities is permissible however, the O'Connor-Breyer approach is that the Constitution forbids the use of such aid for religious instruction or activity.
> The O'Connor-Breyer approach, which permits aid to throughly sectarian institutions but not to their sectarian activities for the moment controls the outcome in the Supreme Court.

Ira C. Lupu and Robert W. Tuttle, "Shifting into Neutral? Emerging Perspectives on the Separation of Church and State," 43 B.C.L. REV. 1139, 1148-49 (2002).[19]

Thus the remaining issues before the Court in determining whether the primary effect of the FIP is to advance religion are: (1) whether the FIP is neutral, (2) whether the FIP grants will be diverted, and (3) whether the FIP creates excessive entanglement

---

[19] The Court of Appeals for the Fourth Circuit similarly summarized O'Connor's concurrence as follows:

> [A]lthough Justice O'Connor and Justice Breyer would not go as far as the plurality, their separate opinion establishes three fundamental guideposts for Establishment Clause cases. First, the neutrality of aid criteria is an important factor, even if it is not the only factor, in assessing a public assistance program. Second, the actual diversion of government aid to religious purposes is prohibited. Third, and relatedly, "presumptions of religious indoctrination" inherent in the pervasively sectarian analysis "are normally inappropriate when evaluating neutral school-aid programs under the Establishment Clause." Mitchell, 530 U.S. at 858.

Oliver, 254 F.3d at 504.

between the churches and the DDA.

### 3. Whether the FIP was Neutral

#### a. Argument

The plaintiffs argue that the FIP was not neutral and discriminated on the basis of sect because the FIP required aid recipients to own downtown real estate and have the ability to pay for 50% of the cost of the improvement or repair. The plaintiffs argue that this requirement was discriminatory because it favored well-established churches over less wealthy institutions. The plaintiffs rely on Larson v. Valente, 456 U.S. 228 (1982), in which the Supreme Court struck down a portion of the Minnesota Charitable Solicitation Act, MINN.STAT. §§ 309.50-309.61 (1969 and Supp.1982), that expressly exempted religious organizations from certain registration and disclosure requirements imposed on charitable organizations generally, but limited the religious organizations entitled to this exemption to those that received at least half their contributions from their own members or affiliated organizations. Id. at 231-32. The Supreme Court held that this portion of the Act was unconstitutional because it made denominational preferences by allowing well-established churches with larger congregations to bypass the registration and reporting requirements that were imposed on newer churches with smaller congregations. Id. at 246, 247 n. 23.

#### b. Resolution

The FIP was neutral. It did not have a sectarian component for selecting eligible applicants. The primary consideration for eligibility was whether the applicant was a property owner or tenant (who received the approval of the property owner) who owned or leased a building, parking lot, or business within Downtown Development Area

No. 1.  The FIP did not define its recipients with reference to religion.  To the contrary, eligibility for funding was completely indifferent to the religious orientation of the applicant, and was open to the secular and non-secular alike.

Moreover, the plaintiffs' argument of sect discrimination is wholly unavailing. The owner/tenant of <u>any</u> church in the designated area could apply for a grant reimbursement.  Thus, <u>Larson</u> is inapposite.  Moreover, the plaintiffs provide no evidence that a particular sect was prevented from participating in the FIP because it could not produce matching funds.  Indeed, the argument fails as a matter of logic because applicants were not required to spend a particular amount in order to participate in the FIP.  The amount of a reimbursement grant depended on what improvements the applicant made and how much the applicant spent.

### 4.  Whether the Reimbursement Grants Will Be Diverted

### a.  The Plaintiffs' Arguments

The plaintiffs argue that if distributed, the reimbursement grants will be diverted for religious use.  First, the plaintiffs argue that government reimbursement for the improvements and repairs to the façades of the structures in which religious education and worship occur will be diverted because the sanctuaries themselves, which are visually identifiable as churches, project a symbolic religious message, as do any stained glass religious depictions, crosses, and plaques of identification on the buildings.  Thus, the reimbursements for facade improvements and repairs will amount to government endorsement of the churches' religious message.

Second, the plaintiffs argue that the reimbursement grants for improvement or replacement of the monolithic signs will be diverted because they identify the

sanctuaries, announce services and sermon topics, and identify their pastors. Thus, the

reimbursements will aid the churches in disseminating their religious messages.

Likewise, the reimbursement grants for the cleaning of stained glass windows,

maintenance and repair of stained glass window frames and the installation of

protective coverings over stained glass windows at the sanctuaries will be diverted

because they will aid in projecting the religious messages conveyed in the stained

glass.

Third, the plaintiffs argue that reimbursements for the improvements to parking

lots will be diverted because the religious worship and mission activities of the churches

are advanced by making their lots more appealing and accessible. Moreover, to the

extent that the churches are relieved from the financial burden of maintaining their

parking lots, the "freed-up" money can be used for advancing the churches' religious

goals. Likewise, reimbursement for the improvements to the nightclub rented out by the

Second Baptist Church will be diverted because the reimbursement frees up money that

would have been spent on maintaining the club for advancing the church's religious

goals. The improvements also have the direct effect of increasing the value of the club,

whose rent is used to support the religious activities and mission of the church.

### b. The Defendants' Arguments

The DDA argues that the grant reimbursement will not be diverted because the

improvements to the church sanctuaries and the ancillary buildings and parking lots are

not inherently religious:

> The façade improvements are no more the pursuit of religious purpose
> than the repaving of a road or sidewalk, replacement of a sewer,
> installation of a decorative street lamp, or the same work performed under

an FIP grant at the tavern next door.  A brick is a brick, a gutter is a gutter.

The United States similarly argues in its *amicus* brief that the DDA is concerned only with the exterior appearance of the private properties approved for reimbursement grants.  The government is thus indifferent to the interior use of the property that receives the grant.  In this context, the issue of "actual diversion" of aid to support religion becomes irrelevant: the activity directly supported by the government –whether sidewalk maintenance or improvements to the building façades – is not itself religious, and any support that the aid will provide for activities that occur within the property, including religious activities, can only be considered incidental.  As such, these activities will not be attributable to the government.

With regards to the monolithic signs, the DDA says that the reimbursements for the improvement or replacement of the signs will not be diverted because the signs themselves are mere blank slates that are constitutionally indistinguishable from those of secular applicants.  Therefore, information included on the signs such as a pastor's name or times of services will not be considered government endorsement of a religious message, but rather, the mere incidental effects of the improvements, which are tolerated under the Constitution.  Likewise, the DDA points out that the it did not install religious images into the churches' stained glass windows.  Instead, the cleaning, repairs and installation of protective coverings over the windows constitutes historical preservation.  Therefore, the government cannot be said to have endorsed a religious message conveyed in the windows.

St. John's argues that with regards to the improvements an repairs to the signs and stained glass windows, the plaintiffs have not met their evidentiary burden in

showing actual diversion. St. John's points out that while the plaintiffs make vague allegations about the religious significance of church signs and stained glass windows, they offer no actual evidence of the religious messages displayed in the signs or stained glass windows included in the FIP grants.

Next, the DDA argues that the FIP should be upheld because it sufficiently prohibits the diversion of the reimbursement grants. The FIP is highly regulated, and the projects that will be reimbursed have already been pre-approved. Likewise, the Façade Program Manager has already received notarized invoices of the completed projects showing exactly what improvements were made. The DDA therefore has already assured that the reimbursement grants will not be diverted.

Alternatively, the DDA argues that if the Court finds that the reimbursement grants will be diverted, the FIP should still be upheld because to prohibit churches from participating in a publicly available program would amount to view-point discrimination in violation of the Free Exercise Clause of the First Amendment.

### c. Resolution

### i.

First, it is not enough for the plaintiffs to argue that the primary effect of the reimbursement grants will be to advance religion merely because the churches will be able to use funds it <u>may</u> have allotted to repairing and improving its properties for religious purposes.[20] The Supreme Court has repeatedly rejected the argument that "all aid is forbidden because aid to one aspect of an institution frees it to spend its other

---

[20] There is no evidence that prior to the implementation of the FIP the churches were planning the improvements or repairs that were completed under the program.

resources on religious ends." Mitchell, 530 U.S. at 824 (citing Comm. For Pub. Educ. and Religious Liberty v. Regan, 444 U.S. 646, 658 (upholding a New York statute authorizing the use of public funds to reimburse church-sponsored and secular nonpublic schools for performing various testing and reporting services mandated by state law)(quoting Hunt, 413 U.S. at 734)).

Next, the FIP requires itemized approval of all the projects both before and after the project is completed. Thus, there is no concern that the reimbursement grants will be diverted for purposes other than the approved and completed projects. Accordingly, the focus of the inquiry must be on the nature of the completed project itself. The Court must analyze whether the reimbursement for a specific type of repair or improvement has the primary effect of advancing a churches' religious message because the grant will in fact be diverted. A line-item analysis of a bricks and mortar project has not been performed before and raises unique issues:

> The O'Connor-Breyer approach, which permits aid to thoroughly sectarian institutions but not to their sectarian activities, for the moment controls the outcome in the Supreme Court . . . This rule, in turn, raises very difficult questions when the state assistance takes the form of payments for bricks and mortar, or any other good which cannot be [easily] segregated into religious and secular components . . . should religious uses, even if de minimus disqualify a structure from any and all government assistance in its maintenance and preservation? The shift, led by O'Connor and Breyer, from an institutional focus to a more surgically precise activity-based focus leaves such questions unanswered.

Lupu & Tuttle, 43 B.C.L. Rev. at 1148-50.

### ii.

The following repairs or improvements to the churches' sanctuaries, ancillary structures, and parking lots clearly will not be diverted and do not lead to governmental

indoctrination:

- repair and replacement of exterior lights;

- cleaning and tuckpointing of masonry and brickwork, and replacement and repair of pieces of masonry and brickwork;

- refurbishing of a steeple clock;

- rebuilding of outdoor planters;

- replacement or repair of exterior doors;

- removal of a canopy or replacement of fabric awning;

- installation of a concrete ramp;

- expansion of an entranceway;

- replacement of an overhang;

- repair or replacement of metal coping;

- painting of exterior doors, building trim, and gutters;

- all of the repairs and improvement to the church-owned parking lots;

- replacement of windows at the Onyx night club owned by Second Baptist Church;

- removal of caulking on the glass at Second Baptist Church's education building

With regard to all these listed projects the improvement and repairs themselves lack content, and therefore convey no religious message.  Moreover, the plaintiffs have failed to provide evidence that the objects receiving the improvement or repairs –be it a door, a light, a gutter, or a parking lot (etc.) – contain iconography or images which convey a religious message.  Therefore, the reimbursement grants for these projects will not be diverted and no governmental indoctrination occurs from these repairs or

improvements.  Instead, all these repairs primarily advance the DDA's goal of beautifying the visual landscape.

**iii.**

The replacement or improvement of the churches' monolithic signs outside the sanctuaries and the work relating to the stained glass windows in the sanctuaries presents, at least in theory, a closer question of whether the reimbursement grants will be diverted to advance the churches' religion missions, and hence result in governmental indoctrination.  This is because a religious image, icon, or message displayed in a window or sign may advance a church's religious mission by advertizing the church's identity or services, soliciting attendance, or by disseminating a religious value or theme.  Under these circumstances, a reasonable observer[21] would attribute the advancement of a church's religious message to the government.   As Justice O'Connor explained in her concurrence in <u>Mitchell</u>, where the government provides aid

---

[21]  As the Court of Appeals for the Sixth Circuit recently commented in <u>American Civil Liberties Union of Ohio v. Capital Square Review and Advisory Board</u>, 243 F.3d 289, 304 (6th Cir. 2001)(en banc)(upholding statute establishing Ohio's state motto as "With God, All Things Are Possible," a quote from Chapter 19, Verse 26 of the Gospel According to Matthew of the New Testament), the "reasonable observer" has been described as follows:

> "the reasonable observer [is] deemed more informed than the casual passerby..." (quoting <u>Capital Square Review and Advisory Board v. Pinette</u>, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring))

also:

> [t]he reasonable observer is "deemed aware of the history and context of the community and forum in which the religious display appears" (quoting <u>Pinette</u>, 515 U.S. at 780 (O'Connor, J., concurring)), [however] such an observer is not to be deemed omniscient.

243 F. 3d at 302

directly to a religious school (as opposed to aid that reaches a school through the independent and private choice of individuals), and the school "uses the aid to inculcate religion in its students, it is reasonable to say that the government has communicated a message of endorsement. Because the religious indoctrination is supported by government assistance, the reasonable observer would naturally perceive the aid program as government support for the advancement of religion." 530 U.S. at 842-43. Similarly, here, where the government (the DDA) provides aid directly to a church and the church uses the aid to advance its religious mission, it is reasonable to say that the government has communicated a message of endorsement.

Accordingly, to determination the constitutionality of the reimbursement grants, a description of the signs and windows which were improved or repaired at each sanctuary is necessary:[22]

_____

[22] The Court refers to the supplemental color photographs provided by St. Johns on July 10, 2007.

## 1. Central United Methodist Church

| Sign Project: Cleaning and repair of sign | Description of Sign: The sign sits within a base made up of brick-like stones. The sign permanently states: "Central United Methodist." Underneath the name of the church is a panel in which letters may be placed to create a message. The message on the panel may be changed.<br><br>In one of the photographs in the record the message displayed is:<br><br>SUNDAY SERVICE 10 AM<br>CAN WE BELIEVE AGAIN?<br>REV EDWIN ROWE REV LEINEKE REV LATHA RAY<br><br>In another photograph in the record, the message displayed is:<br><br>BAG LUNCH FOR THE HOMELESS<br>MONDAY & THURSDAY<br>REV EDWIN ROWE   REV FRANK LEINEKE |
|---|---|
| Window Project: No improvements | Description of Windows: Not applicable |

## 2. Second Baptist Church

| Sign Project: Erection of new sign | Description of Sign: The entire sign is made up of red bricks upon which is permanently mounted "Second Baptist Church" in silver colored letters. There is no panel on which messages can be displayed. |
|---|---|
| Window Project: Unspecified repairs to stained glass windows, re-framing, and installation of protective glass covering | Description of Windows: All the windows contain darkly shaded, clear glass with no identifiable imagery. |

## 3. St. John's

| | |
|---|---|
| **Sign Project:** Erection of a new sign | **Description of Sign:** The sign sets on a base made of multiple brick-like stones. The top of the sign is decorated with eight wrought iron crosses. The sign permanently states "St. John's Episcopal Church." Underneath the name of the church is a digital panel on which a message can be displayed. The digital message on the display can be changed. At the time the photograph in the record was taken, the digital panel displayed the day of the week, date, current time, and temperature in both Fahrenheit and Celsius. |
| **Window Project:** Cleaning of window panes, unspecified repairs, and installation of protective covering | **Description of Windows:** All the windows except for two contain darkly shaded, clear glass with no identifiable imagery. Two windows contain images. One image appears to be of a standing figure dressed in a blue gown with a halo upon its head. The second image appears to be a standing figure dressed in a dark-colored gown. |

With regards to the stained glass windows lacking imagery, the reimbursement grants will not be diverted as the windows convey no religious message. They are simply utilitarian, and no different than the projects approved in section iii, *supra* pp. 34-35.[23] However, reimbursement for the improvement or repair of the two stained glass

---

[23]

[Stained glass] windows may have great historical or artistic significance, and make a substantial contribution to the structure's external appearance. Such windows often present religious themes, however, and help to shape the worship experience through the play of light and imagery . . .

With respect to stained-glass windows that do not involve religious themes, regulation designed to preserve such windows presents a closer

windows displaying figures will be diverted because these images project a religious message to the public which in turn advances the religious mission of the church.  In other words, the stained glass windows are the conduits or medium through which the religious message is disseminated.  Moreover, they are created for the benefit of religious adherence.[24]  Thus, the reimbursements would constitute government endorsement of the religious images in the windows because the government will be giving money <u>directly</u> to the church to improve and preserve those images.

The monolithic signs are also constitutionally infirm because they identify and solicit the churches as sites of Christian worship.  Accordingly, the reimbursement grants will be diverted because the signs display a religious message to the public

––––––––––––––––––––

constitutional question. On the one hand, the use of color in such windows, and the ways in which they regulate the flow of light into the worship space, may influence religious experience. This argument, however, may prove too much for our taste; by analogy, at least some exterior features, such as building height, may also influence the experience of worshipers within. In our view, if the windows do not portray religious themes . . . the case for the constitutional permissibility of state financing becomes considerably stronger.

Lupu & Tuttle, 43 B.C.L. REV. at 1175-76.

[24]  The following exchange between the Court and counsel for St. John's is illuminating:

The Court:     For example, if one of the items had been repair of the alter or one of the religious icons on display in the church, that might not be permissible.

Mr. Schowengerdt:  Sure.  Completely different matter, because in that case, it would be for the specific benefit of the religious adherence.

Hr'g Tr. of June 29, 2007, at 38.

which advances the religious mission of the church.  Thus, reimbursement for the replacement and improvement of the signs will constitute government endorsement of the religious messages displayed in the signs.

Also, it is necessary to address the defendant's argument that these projects pass constitutional muster because the FIP includes a historical preservation component.  It is true that the projects do assist in preserving the historical significance of the churches.  However, the reimbursements for the improvement or repair of the signs and stained glass windows displaying religious images and messages crosses the line because these projects so clearly benefit the religious mission of the churches. Reimbursements for these projects will have the primary effect of advancing religion:

> The crucial question in each case is whether the governmental action effectively advances a secular purpose and provides no more than an "incidental benefit" to religion.  Obviously, whether the governmental action provides no more than an "incidental benefit" to religion is a matter of degree, and the Court must weigh the government's interest in advancing the secular purpose by the means chosen against the resulting "benefit" to religion. [citing McGowan v. Maryland, 366 U.S. 420, 450-52 (1961) (upholding the constitutionality of Maryland's Sunday closing law. The Court held that the law had the secular purpose of providing for a uniform day of rest notwithstanding the fact that the choice of Sunday coincided with the Christian sabbath and therefore provided an 'incidental benefit' to religion')].

Robert A. Sedler, "Understanding the Establishment Clause: The Perspective of Constitutional Litigation," 43 Wayne L. Rev. 1317, 1351-52 (1997):

**iv.**

The Court rejects the DDA's alternative argument that even if the grants will in fact be diverted, the FIP and individual projects must still be upheld because prohibiting funding to the churches in this generally available aid program constitutes viewpoint

discrimination.  The plaintiffs attempt to transport an argument from the "limited open forum" cases[25] which does not apply in the context of a bricks and mortar project like the one here.  The principle derived from the limited open forum cases is that when the government opens up public property to access and use by the public as a limited public forum, the Free Speech Clause requires that the government not restrict the use to groups based on the content of their speech.  The FIP was not designed to create a limited public forum in any way.  Therefore, the Free Speech Clause is not implicated.

### 3. Whether the FIP Creates Excessive Entanglement Between the DDA and the Churches

#### a.  The Standard

To determine whether a government aid program causes excessive entanglement between church and state, courts look to (1) the character and purpose of the institution that is benefitted; (2) the nature of the aid that the state provides, and (3) the resulting relationship between the government and religious authority.  Agostini, 521 U.S. at 323.

#### b.  Argument

The plaintiffs argue that the FIP creates excessive entanglement between the DDA and the churches because the DDA had the authority to control the general appearance of the churches, including the materials used in the projects.

#### c.  Resolution

_____

[25] See e.g. Rosenberger v. Rector and Visitors of the University of Virginia et al., 515 U.S. 819 (1995) (holding unconstitutional a university's denial of funds to student group newspaper that included a Christian editorial viewpoint from a program designed to make payments to outside contractors for the printing costs of publications of student groups).

"Interaction between church and state is inevitable, and we have always tolerated some level of involvement between the two.  Entanglement must be 'excessive' before it runs afoul of the Establishment Clause."  <u>Agostini</u>, 521 U.S. at 233.          The FIP simply does not result in excessive entanglement between the DDA and the three churches.  First, governmental oversight of the projects, to this point in time, has been limited.  The role of the Façade Program Manager, FIP review committee, and FIP review board has been limited to ensuring that the applications fit the eligibility requirements for grant reimbursements.  The fact that the FIP required the projects to adhere to or be complimentary to the architectural features of the existing structures did not create excessive entanglement.  The restrictions on appearance were designed to preserve the historical and aesthetic value of the structures; this promotes the secular legislative purpose of maintaining and increasing the economic value of Development Area No. 1 as a whole.  Next, all the projects had to be completed within ninety-180 days of project approval, and documents verifying completion of the project and payment for the work  had to be submitted and reviewed by the Facade Project Manager within fourteen days.  Program Policies and Guidelines, at sections 1.6.10 and 1.6.12.  Moreover, there will be no additional contact between the government and the churches once the checks are distributed.  These circumstances are comparable to the program upheld in <u>Tilton</u>.  There, the Supreme Court found that the distribution of construction grants to religiously affiliated colleges and universities to build facilities used for secular purposes did not create excessive entanglement between church and state because the government aid was a "one-time single purpose construction grant

with only minimal need for inspection."  403 U.S. at 673.

## VI.  CONCLUSION

Our forefather, Thomas Jefferson, spoke of the need for a "wall of separation between church and state."  Capital Square Review and Advisory Bd., 243 F.3d at 296 (quoting Thomas Jefferson, Letter of January 1, 1802, in 16 Writings of Thomas Jefferson 281-82 (1904)).  Historically, the Establishment Clause has served as this wall.  However, a court faced with an Establishment Clause challenge is obligated to recognize that as the Establishment Clause jurisprudence has moved forward, the wall has become increasingly porous.  Under the principles of Mitchell –including the decline of a strict prohibition of governmental aid to pervasively sectarian institutions, and the increasing favoring of neutral programs – it cannot be said that the FIP, as applied to the three churches here, offends the Establishment Clause.  The FIP was designed to promote business development and growth in Downtown Development Area No. 1 in anticipation of the large number of visitors attending the SuperBowl and All-Star games.  Likewise, the reimbursement grant contracts between the DDA and the three churches, as well as the payment of preliminary architectural and design fees on behalf of the churches, are also constitutional because they will primarily advance this secular goal.  However, the portions of the grants which will reimburse the churches for the improvement or replacement of the monolithic signs and the two stained glass windows at St. John's sanctuary which contain religious imagery do not fit this pattern and are unconstitutional.

Accordingly, the plaintiffs' motion for summary judgment is DENIED IN PART and GRANTED IN PART.  The plaintiff's request for a declaratory judgment that the FIP

is unconstitutional as applied to the churches is DENIED.  Next, the plaintiffs' request

for a declaratory judgment that the distribution of the individual reimbursement contracts

and that the payment of preliminary architectural and design fees on behalf of the

churches are unconstitutional is also DENIED, with EXCEPTION to those portions

which will reimburse the churches for the improvement or replacement of the monolithic

signs outside the sanctuaries and for the work done on the two stained glass windows

containing religious imagery at St. John's sanctuary.  The Court GRANTS the plaintiffs'

request for a permanent injunction restraining the DDA from paying those portions of

the grant reimbursement contracts found to be unconstitutional.

SO ORDERED.


s/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: August 08, 2007
        Detroit, Michigan.


**CODA**

At first glance it would appear that payment by the DDA, a public body, to the

defendant churches runs afoul of the First Amendment.  That may have been the case

under First Amendment jurisprudence of the past.  However, recent precedents of the

Court of Appeals for the Sixth Circuit and the Supreme Court as described in this

opinion now say otherwise in the circumstances of this case.  Certainly the DDA was

entitled to do more than enhance the appearance of the Downtown Development area

No. 1 than to build a Potemkin village.[*]  Also, the plaintiffs should not feel the case they

put was in vain.  Whenever public money passes directly to a church, its First

Amendment implications must be throughly vetted.

---

[*] According to Wikipedia:

Potemkin villages were, purportedly, fake settlements erected at the direction of Russian minister Grigori Aleksandrovich Potemkin to fool Empress Catherine II during her visit to Crimea in 1787. Conventional wisdom has it that Potemkin, who led the Crimean military campaign, had hollow facades of villages constructed along the desolate banks of the Dnieper River in order to impress the monarch and her travel party with the value of her new conquests, thus enhancing his standing in the empress's eyes.

Available at http://en.wikipedia.org/wiki/Potemkin_village.